**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

_____

DARRELL JAMES VARNER,

     Movant,

v.                                                            Cv. No. 2:15-cv-02797-MSN-tmp
                                                             Cr. No. 2:13-cr-20173-JTF-1

UNITED STATES OF AMERICA,

     Respondent.

_____

**ORDER DENYING & DISMISSING MOTION PURSUANT TO 28 U.S.C. § 2255;
ORDER GRANTING A LIMITED CERTIFICATE OF APPEALABILITY;
ORDER CERTIFYING LIMITED APPEAL WOULD BE TAKEN IN GOOD FAITH;
AND
ORDER GRANTING LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL**

_____

     Before the Court are the Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct

Sentence by a Person in Federal Custody ("§ 2255 Motion," ECF No. 1) filed by Darrell James

Varner, Bureau of Prisons ("BOP") register number 25922-076; the Response of the United States

in Opposition to Defendant's Motion to Vacate Sentence Pursuant to 28 U.S.C. § 2255 (ECF No.

7); Varner's Reply to the Response of the United States (ECF No. 9); Varner's Rebuttal Affidavit

(ECF No. 10); the parties' briefs addressing *United States v. Taylor*, 142 S. Ct. 2015 (2022) (ECF

Nos. 43 & 44); the evidence presented at the evidentiary hearing on October 6, 2022 (*see* ECF No.

50); and the parties' post-hearing briefs (ECF Nos. 51 & 55).  For the reasons stated below,

Varner's § 2255 Motion is **DENIED**.

## I.    CRIMINAL CASE NO. 13-20173-JTF-1

On May 21, 2013, a federal grand jury returned an indictment charging Varner with one count of aiding and abetting in the attempt of a robbery affecting commerce ("Hobbs Act robbery"), in violation of 18 U.S.C. §§ 1951 & 2 (Count 1); one count of aiding and abetting Hobbs Act robbery (Count 3), and two counts of the use and carry of a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c) (Counts 2 and 4).  (*See* Cr. No. 13-20173, ECF No. 1.)  Joseph Lamon Fuller was Varner's co-defendant.

Mary Jermann-Robinson was appointed and represented Varner in the trial court.  On September 18, 2013, Varner pled guilty, pursuant to a plea agreement, to the two Hobbs Act robbery counts (Counts 1 and 3) and to the firearm count predicated on attempted Hobbs Act robbery (Count 2).  (*See* ECF No. 51; *see also* ECF No. 53.)  The second firearm count (Count 4) was dismissed at sentencing.  (ECF No. 91.)  The plea agreement states,

> The defendant understands he has been charged with 4 felony counts in the above referenced criminal indictment.  Counts 1 and 3 charge violations of Title 18, United States Code, Section 1951, which carries a maximum penalty of 20 years, up to a $250,000 fine, and up to 3 years supervised release.  Counts 2 and 4 charge violations of Title 18, United State Code, Section 924(c), which carries a minimum penalty of 5 years and a maximum penalty of life (in the case of a second or subsequent conviction the minimum sentence is 25 years), up to a $250,000 fine and up to 5 years supervised release.  There is a $100 dollar special assessment for each felony count of conviction.  Additional fees may be imposed to pay for incarceration or supervised release.

(ECF No. 53 at PageID 60–61.)

Varner agreed that he was "pleading guilty because he is guilty" and that "no threats have been made to induce him to plead guilty."  (*Id.* at PageID 62.)  He acknowledged that there was "no agreement between the parties as to the appropriate length of any term of incarceration."  (*Id.* at PageID 61.)  Varner knowingly and voluntarily waived his right to appeal any sentence

2

imposed by the Court and the manner in which the sentence is determined so long as the sentence is within the specified statutory maximum stated in the plea agreement.  (*Id.* at PageID 6162.) The waiver was "made in exchange for concessions made by the United States."  (*Id.* at PageID 62.)  Varner "knowingly and voluntarily" waived his right to file an action pursuant to Section 2255.  (*Id.*)  However, the waiver does not apply to claims of prosecutorial misconduct and/or ineffective assistance of counsel.  (*Id.*)

At the change of plea hearing, the Government summarized the terms of the plea agreement, including:

- the maximum penalties for each count charged in the indictment,

- the counts on which Varner had agreed to plead guilty,

- that there was no agreement as to the appropriate term of imprisonment,

- the dismissal of Count 4,

- the agreement as to acceptance of responsibility under U.S.S.G. § 3E1.1,

- that acceptance of responsibility is a determination for the Court,

- the waivers of the right to appeal and collateral relief under § 2255,

- that Varner was pleading because he was in fact guilty, and

- that no threats induced him to plead guilty.

(ECF No. 75 at PageID 123–26.)

The Government stated the facts it would be able to prove at trial, as follows:

On March the 13th, 2013, the defendant, and his codefendant, Mr. Fuller, entered a T-Mobile store located at 1425 North Germantown in Memphis, Tennessee at approximately ten a.m.

They were the first customers in the store and the lone clerk had to unlock the door to let them in.

The defendant had on a fur cap with ear flaps, a gray sweatshirt and blue-framed sunglasses.

His codefendant, Mr. Fuller, was shorter and heavier than Mr. Varner and was wearing a skull cap, black sunglasses and a black sweatshirt with the writing And, A-n-d, One, O-n-e on the front.

Once they were inside the defendant produced a handgun and demanded cell phones. The clerk advised him that she [di]d not have the key to open the door to the back area where the phones were located.

Mr. Fuller, the codefendant, then took the clerk to the back of the store and tried to open the door to the manager's office in order to get the cell phones but was unsuccessful.

Both defendants then -- or Mr. Fuller and the defendant then left the store without getting any cell phones.

Around 1:30 p.m. of that same day, which was March the 13th, 2013, the codefendant Mr. Fuller entered another T-Mobile store located at 8385 Highway 64, Memphis, Tennessee wearing the same clothing.

He produced a -- he produced a firearm and demanded cell phones. He forced employees to the back of the store . . . and ordered the employees to . . . put cell phones into T-Mobile bags.

He left the store with four T-Mobile bags loaded with cell phones.

Another employee saw the codefendant Fuller get into a [C]hevy Impala on the passenger's side. The employee was able to get the license plate number of the car which was being driven by the defendant Mr. Varner.

The Memphis Police Department saw the car a few minutes later and began to chase the car through Memphis into Arkansas and into Missouri. The Impala was finally stopped after spike strips were deployed by troopers of the Missouri Highway Patrol.

Officers recovered three bags of the stolen cell phones taken from the T-Mobile located at 8385 Highway 64 store. They also recovered the items of clothing worn by the defendant and his codefendant, including the fur hat with the ear flaps and the sweatshirt with A-N-D O-N-E written on the front.

The government would have been able to show that the serial numbers of the cell phones recovered matched the inventory list from the T-Mobile store at 8385 Highway 64.

> The evidence would also have included videos from both T-Mobile stores. In addition the codefendant, Mr. Fuller, was positively identified by employees of the T-Mobile located at 8385 Highway 64 store.
>
> The government would also have been able to show and prove that the cell phones at both T-Mobile stores are produced outside the state of Tennessee.

(*Id.* at PageID 126–29.)

Jermann-Robinson did not stipulate to the facts. (*Id.* at PageID 129.) She agreed that Varner was guilty of the essential elements that he aided and abetted or did otherwise obstruct, delay or affect commerce by robbery on those two occasions. (*Id.* at 129-30.) Varner did "not necessarily agree with the other facts and those might be appropriate for sentencing." (*Id.* at PageID 130.)

The Court established that Varner was competent, that he read the plea agreement, discussed it thoroughly with his lawyer, and understood the terms of the agreement and the consequences of pleading guilty. (*Id.* at PageID 132–33.) Varner again admitted his guilt. (*Id.* at PageID 135.) The Court addressed the right to trial; the waiver of Varner's rights to trial, appeal, and collateral review; that he decided to plead guilty freely and voluntarily; and that he was satisfied with his lawyer's representation. (*Id.* at PageID 135–40, 147–48.) The Court explained the sentencing process, the Presentence Investigation Report ("PSR") and the Sentencing Guidelines, the statutory range of punishment for the counts to which Varner was pleading guilty, and advised Varner that he could be sentenced within, above, or below the guideline range for these offenses. (*Id.* at PageID 140–46.)The Court noted that the plea agreement states that there is no agreement about the specific sentence Varner would receive and that the dismissal of Count 4 "is a big factor in your favor." (*Id.* at PageID 146.) Varner agreed that the plea agreement was

5

the entire agreement between himself and the Government and that no other promises had been made for the guilty plea. (*Id.* at PageID 148.)

Varner wrote the Court about Jermann-Robinson, and the Court shared the letter with the parties. (*See* ECF No. 101 at PageID 655–56.) Jermann-Robinson then requested a hearing on the record. (*Id.* at PageID 656.) On January 9, 2014, the Court held a status conference to address Varner's concerns about his counsel and the plea. Jermann-Robinson noted that there is an "issue with his trust in my representation"; that "I don't feel like I coerced anyone" and tried to do a good job, but "there are some issues that I was incorrect about, that I advised him about, and I might understand where he . . . may have lost some trust with me in those areas." (*Id.* at PageID 657.) She said, "I missed a couple of things." (*Id.*)

The Government objected to the withdrawal of the guilty plea and stated it believed that the misunderstanding between Varner and his counsel was based on guidelines calculations, but that would not be a basis for withdrawing the plea. (*Id.* at PageID 657–58.) The Government noted that Varner signed a plea agreement stating the plea was voluntary and that he had not been threatened or coerced. (*Id.* at PageID 658.) The Government noted that, "as to the issue of sentencing there was never any, guarantee by anyone as to what the sentence would be because ultimately that, of course, is in the court's hands and [Varner] indicated that he understood that." (*Id.* at PageID 659.)

Varner saw the PSR the Tuesday before the status conference. (*Id.* at PageID 664.) He complained about difficulties communicating with counsel, that she pushed for a plea deal, that he needed a bond so he could access resources and witnesses that could help his case, and that she told me 60 to a hundred months, she guaranteed nothing over a hundred." (*Id.* at PageID 663–65;

6

*see id.* at PageID 673 ("I know this case has not been looked into as deeply as I would look into it if I was if I was not confined. . . . I believe I could have assisted her better").)

Varner said that he had 17 years of schooling and was very competent and could understand information, except when it comes to the law and that "I don't even know my rights." (*Id.* at PageID 666.) The Court said that "we went over that" in the plea colloquy, including the offenses and the possible punishments, and noted that "in light of the times you've come into court and the discussions that we've had and the information I received, and then, you know, going over all the facts and the trial rights and things. . . . So, although you write a letter about being confused, you know, it's hard for me to see that." (*Id* at PageID 666–67, 669.) Varner said that ultimately, he was thinking that, if she said 60 to 100 months, he would just do the time and get it over. (*Id.* at PageID 671–72.) He acknowledged that 25 years was "getting knocked off" with the plea. (*Id.* at PageID 672.) But he felt that every avenue was not considered, and "it was all about a deal." (*Id.*)

Varner told the Court he had no questions about the case and that he knew the case better than anybody. (*Id.* at PageID 673–74.) He wanted to rescind his guilty plea and wanted a bond so he could fight his case fairly." (*Id.* at PageID 674.)

Jermann-Robinson said she did "make an error and miss some things that would show up" in the PSR, some things that she felt she should have gotten, and she did not want Varner to suffer because of that. (*Id.* at PageID 677.) She acknowledged that she had family issues which may have led to a lack of communication. (*Id.*) She felt that Varner did not trust her. She did not know if that could be repaired and felt that the best course was for another attorney to look at the case and advise him before he withdrew his plea. (*Id.* at PageID 678.)

The Court believed that there were issues of communication and trust between Varner and Jermann-Robinson and that it seemed that Varner "is more upset about the deal thinking that he is

7

entering into a bad deal, especially after seeing the Presentence Report." (*Id.* at PageID 680–81.) Based on the colloquy and the discussions about the case, the Court was comfortable that "Mr. Varner came in here and changed his plea with a full understanding of what he was doing." (*Id.* at PageID 681–82.) The Court reserved ruling on the matter until a later date. (*See* ECF No. 65.)

On January 27, 2014, Jermann-Robinson represented to the Court at a status conference that the conflicts with Varner appeared to have been resolved and that Varner wanted to withdraw his guilty plea. (*See* ECF No. 71.) The Court advised that Varner would have to file a motion to withdraw the guilty plea and give the Government an opportunity to respond. (*Id.*; *see* ECF No. 73.) Jermann-Robinson filed a motion to withdraw from the representation (*see* ECF No. 67) and a motion to withdraw the guilty plea (ECF No. 74). She argued that "[i]n discussing this case with Defendant and preparing for sentencing, Defendant has asserted and maintained his innocence, and it has become apparent to his counsel that he should not have entered a guilty plea" and that "new information that could potentially exonerate the defendant from two of the four charges, was uncovered by the Defendant." (*Id.* at PageID 106–07.) However, the motion did not specify what the evidence was or which counts were affected.

At the hearing, Jermann-Robinson revealed that the new evidence was about an alibi witness for the second robbery. (ECF No. 103 at PageID 711–12.) The Court heard and denied the motion to withdraw the guilty plea on February 13, 2014. (ECF No. 78; *see* ECF No. 103 at PageID 722–29.)

The PSR was calculated based on the 2013 Guidelines Manual and found a total offense level of 34, a criminal history category of II, and a Guidelines imprisonment range of 168 to 210 months, which included a two-level enhancement under U.S.S.G. § 2B31.(b)(4)(B) for physical restraint, a six-level enhancement under U.S.S.G. § 2B3.1(b)(2)(B) for using a firearm against

8

James Kellum, a one-level enhancement for a loss exceeding $10,000 under U.S.S.G. § 2B3.1(b)(7)(B), a six-level enhancement under U.S.S.G. § 3A1.2(c)(1) because the fleeing car almost hit a law enforcement officer, a two-level enhancement for obstruction of justice because of the reckless creation of a substantial risk of death or serious bodily injury in the course of fleeing law enforcement under U.S.S.G. § 3C1.2, and a three-point reduction for acceptance of responsibility. (*See* PSR, ¶¶ 17, 23–26, 28, 35–36, 82.) *See United States v. Varner*, 598 F. App'x 389, 390-91 (6th Cir. 2015).

Jermann-Robinson filed objections to the PSR. (ECF No. 82.) After receiving the PSR, the government shared the video documenting the car chase. *Varner*, 598 F. App'x at 391. Varner objected to the six-level sentencing enhancement under § 3A1.2(c)(1) because, at the time of his plea, he did not know the video existed. *Id.* The Court overruled Varner's objection at sentencing and applied the sentencing enhancement. *Id.* The guidelines range was 121 to 151 months imprisonment for the robbery counts and a mandatory minimum of 60 months imprisonment for the firearms count to be run consecutive to the robbery counts. *Id.*

The sentencing hearing began on March 14, 2014, and was continued to April 11 and 14, 2014. (ECF Nos. 84, 88, 91.) Varner was sentenced to concurrent 121-month terms of imprisonment on Counts 1 and 3, and a 60-month term on Count 2, to be served consecutively, for a total sentence of 181 months imprisonment, to be followed by five years on supervised release. (ECF No. 93 at PageID 181–82.)

Varner appealed. (ECF No. 95.) He challenged his plea agreement as not knowing and intelligent and invalid because he was not aware of the dashboard-camera footage that formed the basis for the six-level sentencing enhancement under U.S.S.G. § 3A1.2(c)(1), and alleged

ineffective assistance of counsel.  (ECF No. 109 at PageID 748, 751.)  *See Varner*, 598 F. App'x at 391.

> The Sixth Circuit summarized the facts of the case:
>
> On the morning of March 13, 2013, Varner and his codefendant, Joseph Fuller, unsuccessfully attempted to rob a T–Mobile store in Memphis.  Later that same day, they successfully robbed a different T–Mobile store before leading authorities on a multi-state, high-speed car chase.  At some point during the chase, defendants abruptly changed lanes and drove towards an officer who was deploying a spike strip on the side of the road.  The officer moved to avoid being hit.  Varner and Fuller were detained soon after.

*See Varner*, 598 F. App'x at 390.  The Sixth Circuit affirmed the trial court and determined that Varner knowingly and voluntarily entered the plea.  (*See* ECF No. 109 at PageID 751.)  *See id.* at 391–92.  The Sixth Circuit noted, "Varner explicitly acknowledged that he was aware of that sentencing range, and there were no 'affirmative misstatements of the maximum possible sentence.'  It does not matter, therefore, that he may not have been aware of certain evidence that would support a sentencing enhancement."  *Id.* at 391 (citations omitted).  The Sixth Circuit declined to review Varner's ineffective-assistance-of-counsel claims on direct appeal because the record before the appellate court had not been adequately developed.  *Id.*

## II.   THE § 2255 MOTION

On December 10, 2015, Varner filed the instant § 2255 Motion.  (ECF No. 1.)  He alleged the following claims of ineffective assistance of trial counsel:

1. Failure to conduct a prompt investigation of the circumstances of the case;

2. Failure to give accurate advice about Varner's criminal history category and whether physical restraint applied; and

3. Failure to advise Varner adequately so that he understood the full nature of the crime charged and the consequences of the guilty plea.

(ECF No. 1 at PageID 4; *see* ECF No. 1-2 at PageID 18, 20–31.)

10

On October 18, 2016, the United States filed its response with the affidavit of Varner's trial and appeal counsel.  (*See* ECF No. 7.)  On November 18, 2016, Varner filed a reply and rebuttal affidavit.  (ECF Nos. 9 & 10.)

On August 15, 2019, Varner filed a motion seeking amendment of his pending § 2255 Motion to assert that, under *United States v. Davis*, 139 S. Ct. 2319 (2019), aiding and abetting Hobbs Act robbery is not a crime of violence that would support a conviction under 18 U.S.C. § 924(c).  (ECF No. 16 at PageID 118–20, 130–32.)  The Court denied the motion because Varner would not have had a valid claim under Sixth Circuit precedent, and amendment would have been futile.  (ECF No. 17 at PageID 148.)  After the Supreme Court's decision in *United States v. Taylor*, 142 S. Ct. 2015 (2022), the Court directed the parties to file briefs addressing whether *Taylor* was applicable to Varner's case.  (*See* ECF Nos. 42 through 44.)

The Court determined that an evidentiary hearing was needed to resolve Varner's claim of ineffective assistance concerning the plea proceedings.  (ECF No. 18 at PageID 150.)  The evidentiary hearing was held on November 2, 2022.  (ECF No. 48.)  The parties filed post-hearing briefs in January and February of 2023.  (ECF Nos. 51 & 55.)

## III.   STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 2255(a),

[a] prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

"A prisoner seeking relief under 28 U.S.C. § 2255 must allege either: (1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that

was so fundamental as to render the entire proceeding invalid." *Short v. United States*, 471 F.3d 686, 691 (6th Cir. 2006) (citation and internal quotation marks omitted).

A § 2255 motion is not a substitute for a direct appeal. *See Bousley v. United States*, 523 U.S. 614, 621 (1998). "[N]onconstitutional claims that could have been raised on appeal, but were not, may not be asserted in collateral proceedings." *Stone v. Powell*, 428 U.S. 465, 477 n.10 (1976). "Defendants must assert their claims in the ordinary course of trial and direct appeal." *Grant v. United States*, 72 F.3d 503, 506 (6th Cir. 1996). This rule is not absolute:

> If claims have been forfeited by virtue of ineffective assistance of counsel, then relief under § 2255 would be available subject to the standard of *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). In those rare instances where the defaulted claim is of an error not ordinarily cognizable or constitutional error, but the error is committed in a context that is so positively outrageous as to indicate a "complete miscarriage of justice," it seems to us that what is really being asserted is a violation of due process.

*Grant*, 72 F.3d at 506.

Even constitutional claims that could have been raised on direct appeal, but were not, will be barred by procedural default unless the defendant demonstrates cause and prejudice sufficient to excuse his failure to raise these issues previously. *El-Nobani v. United States*, 287 F.3d 417, 420 (6th Cir. 2002) (withdrawal of guilty plea); *Peveler v. United States*, 269 F.3d 693, 698–99 (6th Cir. 2001) (new Supreme Court decision issued during pendency of direct appeal); *Phillip v. United States*, 229 F.3d 550, 552 (6th Cir. 2000) (trial errors). Alternatively, a defendant may obtain review of a procedurally defaulted claim by demonstrating his "actual innocence." *Bousley*, 523 U.S. at 622.

After a § 2255 motion is filed, it is reviewed by the Court and, "[i]f it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the judge must dismiss the motion . . . ." Rule 4(b), Rules Governing Section

2255 Proceedings for the United States District Courts ("Section 2255 Rules").  "If the motion is not dismissed, the judge must order the United States Attorney to file an answer, motion, or other response within a fixed time, or to take other action the judge may order."  *Id*.  The movant is entitled to reply to the Government's response.  Rule 5(d), Section 2255 Rules.  The Court may also direct the parties to provide additional information relating to the motion.  Rule 7, Section 2255 Rules.

"In reviewing a § 2255 motion in which a factual dispute arises, 'the habeas court must hold an evidentiary hearing to determine the truth of the petitioner's claims.'"  *Valentine v. United States*, 488 F.3d 325, 333 (6th Cir. 2007) (quoting *Turner v. United States*, 183 F.3d 474, 477 (6th Cir. 1999)).  "'[N]o hearing is required if the petitioner's allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact.'"  *Id*. (quoting *Arredondo v. United States*, 178 F.3d 778, 782 (6th Cir. 1999)).  Defendant has the burden of proving that he is entitled to relief by a preponderance of the evidence.  *Pough v. United States*, 442 F.3d 959, 964 (6th Cir. 2006).

IV.   **ANALYSIS**

Varner's ineffective assistance of counsel claims concerning his plea, including the calculation of the criminal history category and the application of certain sentencing guidelines, are before the Court, along with the *Taylor* claim.  The Court will first address the ineffective assistance claims.

A.  **INEFFECTIVE ASSISTANCE OF COUNSEL**

A claim that ineffective assistance of counsel has deprived a defendant of his Sixth Amendment right to counsel is controlled by the standards stated in *Strickland v. Washington*, 466

U.S. 668 (1984). To demonstrate deficient performance by counsel, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688.

> A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. [*Strickland*, 466 U.S.] at 689. The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.*, at 687.

*Harrington v. Richter*, 562 U.S. 86, 104 (2011).

To demonstrate prejudice, a prisoner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.[1] "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

> It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." [*Strickland*, 466 U.S.] at 693, 104 S. Ct. 2052. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.*, at 687, 104 S. Ct. 2052.

*Richter*, 562 U.S. at 104; *see also id.* at 111–12 ("In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. . . . The likelihood of a different result must be substantial, not just conceivable." (citations omitted)); *Wong v. Belmontes*, 558 U.S. 15, 27 (2009) (per curiam) ("But *Strickland* does not require the State to 'rule out' [a more favorable outcome] to prevail. Rather, *Strickland*

---

[1]"[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant." *Strickland*, 466 U.S. at 697. If a reviewing court finds a lack of prejudice, it need not determine whether, in fact, counsel's performance was deficient. *Id.*

14

places the burden on the defendant, not the State, to show a 'reasonable probability' that the result would have been different." (citing *Strickland*, 466 U.S. at 694)).

"Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).

> An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. *Strickland*, 466 U.S., at 689–90, 104 S. Ct. 2052. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." *Id.*, at 689, 104 S. Ct. 2052; *see also Bell v. Cone*, 535 U.S. 685, 702, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002); *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S. Ct. 838, 122 L. Ed. 2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland*, 466 U.S., at 690, 104 S. Ct. 2052.

*Richter*, 562 U.S. at 105.

The Sixth Amendment right to effective counsel extends to the plea-bargaining process and is governed by the two-prong *Strickland* test. *Lafler v. Cooper*, 566 U.S. 156, 162 (2012) (citing *Missouri v. Frye*, 566 U.S. 133, 140–41 (2012)); *Hill v. Lockhart*, 474 U.S. 52, 57 (1985). To establish constitutionally ineffective assistance in the plea-bargaining process, the movant must show not only that counsel was deficient, but that the outcome of the plea process would have been different with competent advice. *Id.*

The Supreme Court cases on counsel's deficient performance during plea discussions generally fall into two categories: (1) counsel failed to communicate a favorable plea offer to the defendant before the time to accept the offer had expired, *see*, *e.g.*, *Frye* (counsel's failure to communicate a formal offer from the prosecution to accept a plea on terms and conditions that

may be favorable to the accused constitutes deficient performance); or (2) counsel gave materially inaccurate sentencing information or advice to defendant who, based on that advice, rejected the offer and proceeded to trial, *see*, *e.g.*, *Hill* (counsel's failure to accurately inform the defendant of the amount of time he would have to spend in prison before he became eligible for parole constituted deficient performance).  The Sixth Circuit has relied on the plea-colloquy advisement of rights to preclude later claims that counsel's advice was misleading:

> When an ineffective-assistance claim is based on misleading information regarding the consequences of a plea, a proper plea colloquy is generally deemed to cure any misunderstanding the defendant may have had about the consequences of the plea. The court's proper advisement of rights is thus deemed to "foreclose" any showing of actual prejudice attributed to counsel's erroneous advice, because the defendant is deemed bound by his statements in response to the court's inquiry.  Otherwise, the plea colloquy process would be rendered meaningless if a defendant could reopen the record by later asserting that actually, he misunderstood.

*United States v. Pola*, 703 F. App'x 414, 423 (6th Cir. 2017) (citations omitted); *see Thompson v. United States*, 728 F. App'x 527, 535 (6th Cir. 2018).

To establish prejudice, the movant must show a reasonable probability that, but for his attorney's unreasonable assessment of the likely length of sentence, he would not have entered the plea and would have proceeded to trial.  *Pola*, 703 F. App'x at 423.  This assessment requires "examination of the totality of the evidence," whether the defendant had a viable defense, and the respective consequences of a conviction after trial and by plea.  *Id.*

Varner argues that his decision to sign the plea agreement was greatly influenced by his counsel's erroneous advice.  (ECF No. 1-2 at PageID 18.)  He asserts that, in error, his counsel advised him that the amount of loss associated with the robbery did not exceed $10,000; that physical restraint was not applicable; that he would be sentenced under Criminal History Category I, and that there were no additional circumstances relevant to the case.  (*Id.*)  Varner contends that,

had his counsel advised him appropriately, he would have foreseen a harsher sentence of at least 10 years, taken the gamble of an acquittal, or sought a different plea agreement. (*Id.*) He argues that he was prejudiced because his counsel's incorrect advice caused him to presume that the consequences of the plea agreement would not be harsh enough to outweigh the stresses of proceeding to trial. (*Id.*) Varner asserts that, in the absence of counsel's error, he would have made a different decision with regard to a plea. (*Id.* at PageID 19.)

Jermann-Robinson contends that she determined, through discovery, that both armed robberies were captured on film and that firearms were clearly used in connection with both robberies. (ECF No. 7-1 at PageID 75.) Varner was the driver of the getaway vehicle. (*Id.*) She noted that the cellphones were found in the getaway vehicle. (*Id.*) Jermann-Robinson reviewed and discussed the facts and discovery with Varner at length. (*Id.*) She advised Varner that, if he were convicted of both violations of 18 U.S.C. § 924(c), the sentence for those charges alone would be "no less than 30 mandatory years (5 years for the first count and 25 years for the second count)." (*Id.*) She recommended that Varner accept the plea because of the dismissal of one § 924(c) count, which, if Varner had been convicted, would have resulted in an additional mandatory twenty-five-year sentence. (*Id.*) Additionally, the fact that Fuller's counsel memorialized in writing that Fuller might testify against Varner was discussed at length in consideration of the guilty plea. (*Id.* at PageID 76.) Jermann-Robinson testified that Varner "was concerned about doing time at all because he didn't really have much of a record. I mean, I think that's more than fair to say, but the 25 years was a sticking point, I think, that he and I both wanted to get rid of." (ECF No. 50 at PageID 288.)

Varner testified that he and Jermann-Robinson went through the sentencing guidelines book and she "pretty much just tells you the offense level and how it applies to the guidelines and

then each enhancement and how many points will be added to that guidelines due to the enhancement." (ECF No. 50 at PageID 233.) They discussed the base offense level, possible enhancements that could raise the offense level and how that could increase the number of months that he would be incarcerated. (*Id.* at PageID 233–24.) They discussed how certain evidence could result in the application of certain enhancements, and he relied on her representations about the guidelines in forming his decision to plead guilty. (*Id.* at PageID 238–40.)

Jermann-Robinson's testimony regarding their review of the sentencing guidelines was similar to Varner's in that she testified that she carefully went through each guideline and gave her opinion about which ones applied, but "I'm not guaranteeing that they won't apply." (*Id.* at PageID 281–82.) She said, "we discuss that there's going to be a sentencing hearing and that the Judge will have final say-so." (*Id.* at PageID 282.)

Varner testified that he relied on Jermann-Robinson's advice about the application of the guidelines and what the sentence could be in deciding to accept the plea agreement, in disregard to the sentencing judge's statements during the plea colloquy about the potential penalties, that he could receive a sentence above or below the guidelines, and that there was no guarantee about the sentence. (*Id.* at PageID 240, 246, 255, 260–62.) Varner testified that, as to the sentence, he knew that he would be incarcerated five years because of the mandatory minimum, "but in speaking with Mary Robinson, it was like five years to eight years, you know, and I was kind of straddling that eight years. But, you know, she was like I'll argue the five, you're exposed to eight. 60 to 101 months." (*Id.* at PageID 242.) As far as a cutoff in his mind, when it would be worth it to risk trial, it would be eight years, because "I didn't want nothing close to ten. You know, I wanted to go to trial if it was anything close to ten." (*Id.* at PageID 241–42.) Had he known that the sentence would be 181 months, he would not have pled guilty or waived his constitutional right to trial. (*Id.*

18

at PageID 244–46.)  Varner admitted that the 25-year mandatory sentence on the second § 924(c) count was a factor in his decision to enter a plea.  (*Id.* at PageID 270.)

Jermann-Robinson denied that she told Varner his total sentence would be five to eight years.  (*Id.* at PageID 282.)  She also did not recall Varner saying he did not want to plea if he risked being imprisoned ten years.  (*Id.*)

The Government argues that the allegations are unsubstantiated accusations "without any supporting facts" and without merit.  (ECF No. 7 at PageID 68.)  The Government asserts that Varner has failed to show that his counsel's performance fell below an "objective standard of reasonableness" under "prevailing professional norms."  (*Id.*)  The Government argues that Varner has not shown that, but for Jermann-Robinson's errors, the outcome would have been different, nor has Varner successfully demonstrated that he would not have pleaded guilty and would have insisted on going to trial "but for" counsel's alleged ineffectiveness.  (*Id.*)

The Government contends that Varner has not satisfied the *Strickland* analysis for any of his ineffective assistance claims and has not demonstrated that he would have proceeded to trial on all four counts.  (ECF No. 7 at PageID 63.)

### 1. Investigation

Varner alleges that Jermann-Robinson failed to conduct a prompt investigation of the case, and her advice was "ineffective which served as prejudice" to Varner in his decision to waive trial and accept the plea.  (ECF No. 1-2 at PageID 20.)  Varner asserts that he "felt as though he could be exonerated via trial because he was never identified at either store, no weapons were recovered, and there was also an alibi witness who[] could potentially come forward in his favor."  (*Id.*)  He "did not want to go through the stresses of trial, the burden on his family, and the slight possibility of being convicted to an even harsher punishment."  (*Id.*)  He contends that he accepted the plea

agreement because of the benefits of the acceptance-of-responsibility reduction (3 points)[2] and the dismissal of Count 4, the second § 924(c) violation.  (*Id.*)  Varner had never been in prison, was family-oriented with a one-year-old son, and would not have been accepting of a sentence of "even ten-years."  (*Id.*)

Varner argues that his counsel did not conduct a prompt investigation as it relates to:

- The robbery loss of $16,849.68, based on the value of the phones and relevant to the U.S.S.G. § 2B3.1(b)(7)(B) enhancement; and

- Varner's arrest by Missouri Highway Patrol, in which he was charged with assault on a law enforcement officer in Pemiscott County relevant to U.S.S.G. § 3A1.2(c)(1).

(*Id.* at PageID 20–21.)  He contends that he was deprived of information that carried an accumulation of four-to-five years (seven points) of additional jail time, and if he had been advised of this possibility, he would have definitely proceeded to trial.  (*Id.* at PageID 22.)

### a.  Amount of Loss

Varner asserts that the amount of loss based on the value of the phones was relevant to his plea because of the one-level enhancement for a loss exceeding $10,000 under U.S.S.G. § 2B3.1(b)(7)(b).  (ECF No. 1-2 at PageID 21.)  He contends that, before waving his right to trial, he "profusely asked counsel how much the robbery loss amounted to."  (*Id.*)  Varner asserts that his counsel had a "strong reason to presume that investigating the costs of the phones was a duty" she owed him, and it was within her ability.  (*Id.*)  He notes that Assistant United States Attorney Lorraine Craig contacted FBI Agent Dayne Henriques to obtain information on the amount of loss,

---

[2] Varner states that the "acceptance-of-responsibility credit held a prominent role" and "significant role" in his decision to plead guilty because it reduced his sentencing exposure to under nine years.  (ECF No. 1-2 at PageID 23, 25.)

and Henriques provided exact dollar amounts for the stolen phones.  (*Id.*)[3]  Varner argues that there is no reason his counsel could not have discovered this information.  (*Id.*)  Varner notes that the Court granted his counsel additional time to complete discovery on these matters.  (*Id.* at PageID 21; (ECF No. 9 at PageID 89.)  Instead, Varner asserts that his counsel advised him that the costs of the phones was "right under $10,000."  (ECF No. 1-2 at PageID 22.)  He contends that his counsel's attempt to make an accurate prediction is not an alternative to actual knowledge of the amount of loss, and it would have only taken a call to Henriques to obtain the correct information.  (*Id.*)

In his affidavit, Varner states that, during the plea negotiation stage, Jermann-Robinson informed him that a robbery loss can have an effect on his projected sentence and that his sentence could increase with a loss amount of $10,000.  (ECF No. 10 at PageID 102.)  He contends that this issue was addressed "as more of an informative expectation of how the guideline system function[s]."  (*Id.*)  Varner asserts that after the Government offered a plea deal, he again inquired about the robbery loss and that Jermann-Robinson "again told me that I was under $10,000" and that "I didn't have to worry about a robbery loss enhancement because the phones weren't over $10,000."  (*Id.* at PageID 102–03.)

At the evidentiary hearing, Varner testified that Jermann-Robinson discussed the one-level enhancement for an amount of loss of $10,000 or more.  (ECF No. 50 at PageID 236.)  She determined that it would not apply to him, and he relied on her opinion when entering the plea.  (*Id.* at PageID 236, 257–59.)  Varner said that she claimed that, because the phones had been

---

[3] At sentencing, Henriques testified that the total retail value of the phones was $16,489.68 based on information obtained from T-Mobile's loss prevention manager.  (*See* Cr. No. 13-20173, ECF No. 96 at PageID 205.)  The hearing had been continued for two weeks from the original setting to obtain this information.  (*See* ECF No. 99 at PageID 411–12, 492.)

recovered, it would count against the loss amount. (*Id.* at PageID 256.) He contends that she did not further discuss the issue of the amount of loss until after the plea when they received the PSR. (*Id.* at PageID 258; *see* ECF No. 10 at PageID 102–03.) Then, Jermann-Robinson said that, if it does apply, I will argue the issue at sentencing, and she filed an objection. (ECF No. 50 at PageID 259–60.)

Jermann-Robinson denies that she failed to ascertain the value of the cell phones obtained in the robbery. (*See* ECF No. 7-1 at PageID 76.) She contends that she investigated the value of the types of phones taken, how many were recovered, and determined a lag in time between the arrest and the valuation of the phones. (*Id.* at PageID 76–77.) She testified that she researched on the internet, spoke with the phone company, and looked at the depreciated value of the phones. (ECF No. 50 at PageID 280.) Because there had been some delay, she felt that she had a good faith basis to argue that the loss was under $10,000. (*Id.*) She discussed these issues with Varner and informed him that the amount of loss would be an issue at the sentencing hearing which would ultimately be determined by the Court. (*Id.* at PageID 77.) Jermann-Robinson testified that she made no guarantee that Varner would not receive the one-level enhancement at sentencing and that she "always say[s] that the Court's going to make the final decision." (ECF No. 50 at PageID 280.)

Jermann-Robinson objected to the value of the phones at the sentencing hearing. (ECF No. 1-2 at PageID 77.) The record demonstrates that "[o]ut of an abundance of caution," she objected to the enhancement for the value of the cell phones and requested an itemization of the loss, including what was recovered. (*See* ECF No. 7 at PageID 65; *see* Cr. No. 13-20173, ECF No. 82 at PageID 165.) Jermann-Robinson argued that the amount of loss "even if these phones can only be sold for half of what their original value was, that would still be less than $10,000." (*See* ECF

No. 97 at PageID 296–98.)  The phones were still in the boxes and probably able to be sold, although the value may have decreased because the FBI holds onto them.  (*Id.* at PageID 297–98.) Jermann-Robinson stated, "[t]o me the value I don't think is anywhere near what the 16,000-dollar mark on that chart is."  (*Id.* at PageID 298.)  At the evidentiary hearing, she testified about the objection and her demand for proof at the sentencing hearing, but the Court decided against her. (Civ. No. 15-2797, ECF No. 50 at PageID 284, 298.)  It remains her opinion that the amount of loss was under $10,000.  (*Id.* at Page 293–94.)

The Government argues that Varner has not provided any evidence to show that Jermann-Robinson did not fully investigate the loss amount or advocate against the enhancement related to the amount of loss.  (Civ. No. 15-2797, ECF No. 7 at PageID 65.)  Varner notes that Jermann-Robinson does not dispute that she repeatedly told Varner that the robbery loss was less than $10,000.  (ECF No. 9 at PageID 89.)  Varner asserts that Jermann-Robinson's actions at sentencing are irrelevant to his advice on this issue as it relates to the plea.  (ECF No. 9 at PageID 89–90.)

Jermann-Robinson conducted some investigation into the amount of loss before the plea proceedings and spoke to Varner about the potential effect of the amount of loss on his sentence. She gave her opinion that the amount of loss was under $10,000, and when it turned out that the loss calculated in the PSR was in excess of $10,000, she objected at sentencing, demanded proof, and argued that the amount of loss should be reduced because the phones were recovered. Although Jermann-Robinson's argument was not compelling to the Court, her performance was not deficient for failing to investigate the loss amount or the advice she gave Varner, especially where she made no guarantees about the Court's determination of that amount and Varner was aware that the Court would ultimately determine his sentence.

Further, Varner has not shown prejudice where, given the totality of evidence, he lacked a viable defense, admitted his guilt, was a participant in the first robbery and the getaway driver for the second robbery,[4] and benefitted by having his sentence reduced 25 years because of the plea and the dismissal of Count 4.  Varner attempts to argue that he would not have taken a plea for any sentence near ten years.  Given the maximum penalties that he faced, however, including 30 years on the gun charges alone, his contentions about his plea and the length of his sentence are unreasonable, and apparently were never communicated to his counsel.  (*See* ECF No. 50 at PageID 282.)  Varner has not demonstrated that there was a reasonable probability that he would have gone to trial and faced a sentence in excess of thirty (30) years, when he claims that he did not want to serve a 10-year sentence.  Varner has not demonstrated that his counsel was ineffective with regard to the amount of loss.

### b.  Assault Charge in Pemiscott County

In Paragraph 26 of the PSR, the six-point victim-related adjustment under U.S.S.G. § 3A1.2(c)(1) was imposed

> Because, in a manner creating a substantial risk of serious bodily injury, the defendant or a person for whose conduct the defendant is otherwise accountable, knowing or having reasonable cause to believe that a person was a law enforcement officer, assaulted such officer during the course of the offense or immediate flight therefrom, six levels are added.  The defendant and co-defendant almost hit a Missouri State Highway Patrol trooper as he was deploying spike-strips to disable their vehicle.

(*See* PSR ¶ 26.)

---

[4] Varner has never presented evidence from the purported alibi witness to show that he was not involved in the second robbery, and he was the driver in a chase that began shortly after the second robbery.

In Ground One, Varner argues that his arrest for assault on a law enforcement officer in Pemiscott County, Missouri for swerving in the direction of a state trooper in an attempt to dodge the spike strips was a direct circumstance of this case, and that the assault charge, although dismissed, was grounds for a six-level increase to his federal sentence under U.S.S.G. § 3A1.2(c)(1). (ECF No. 1-2 at PageID 21.)  Varner contends that, if his counsel had investigated the arrest, she would have been able to foresee the possibility of a § 3A1.2(c)(1) enhancement. (*Id.*)  He asserts that investigating the circumstances of the arrest and interviewing the law enforcement officers involved was within her ability, and she was granted additional time to do so. (*Id.*)  Varner contends that, it was not the dash camera footage that incriminated him, but Officer Van Meter's testimony. (ECF No. 10 at PageID 102.)  Varner asserts that Jermann-Robinson had a copy of the Missouri charge, but she disregarded the information. (*Id.*)

In Ground Three, Varner argues that, at the time of his plea hearing, his counsel had not yet obtained the video showing the assault on the Missouri state trooper that impacted his sentence. (ECF No. 1-2 at PageID 25.)[5]  It was not until the sentencing proceedings in April 2014 that Jermann-Robinson obtained the video. (*Id.* at PageID 27.)  Varner contends that his counsel, as a result, did not advise him properly about the ramifications of his decision to plead guilty, and thus, her performance was ineffective. (*Id.*)  Consequently, he contends that his plea was not knowing and intelligently made. (*Id.* at PageID 25–26.)[6]  Varner asserts that he was prejudiced because he was never advised that his sentence could be enhanced based on information from the Pemiscott

---

[5] This argument was made in connection with Ground III, which argues that the plea was not knowing and voluntary due to counsel's ineffectiveness. (*See* ECF No. 1-2 at PageID 25.)

[6] The Sixth Circuit has established that the plea was knowing and voluntarily made although Varner was not aware of the applicability of certain sentencing enhancements. *Varner*, 598 F. App'x at 391.

County arrest.  (*Id.* at PageID 26.)  He contends that the sentencing range increased by 58 to 73 months and that a five- to six-year increase would have significantly affected his decision.  (*Id.*)  Varner argues that his counsel's investigation into the Pemiscott County arrest was vital to his defense, and he did not receive effective assistance of counsel during the vital stages of the plea-bargaining process.  (*Id.* at PageID 28.)

In Jermann-Robinson's affidavit, she addresses these claims as an allegation that she failed to obtain the Missouri Highway Patrol's dash camera footage before Varner's guilty plea.  (ECF No. 7-1 at PageID 75.)  She acknowledges that she "did not possess and was not aware" of the dash camera footage at the time of the plea offer.  (*Id.*)  However, she had a copy of the order dismissing the charges for the Missouri arrest.  (*Id.*)  She states that "[b]ased upon my review of the discovery, my own investigation, my review of the arrest report made in Missouri, and not having the dash camera video, I did not anticipate that this enhancement would apply."  (*Id.* at PageID 77.)  Jermann-Robinson "did not feel that . . . any law enforcement officer was injured or at risk of injury" as she had "discussed the facts of the case with Mr. Varner, interviewed officers involved and determined that this was not a high speed chase."  (*Id.* at PageID 75, 77.)  Jermann-Robinson contends that she discussed her review with Varner and also discussed the facts that his conduct could result in a flight jury instruction if they were to go to trial.  (*Id.*)

Jermann-Robinson did not learn of the dash camera footage until the pre-sentence interview.  (*Id.* at PageID 75–76.)  A probation officer had obtained it from the Missouri Highway Patrol after the plea.  (*Id.* at PageID 76.)  She then obtained a copy, objected to its use at sentencing, and filed a motion to withdraw the guilty plea.  (*Id.*)[7]

---

[7] Counsel objected to the enhancement and argued that Varner did not intend to hurt the trooper in question or any other officer.  (Cr. No. 13-20173, ECF No. 82 at PageID 164.)  She

The Government contends that the facts and circumstance of this case along with counsel's affidavit demonstrate that Jermann-Robinson's performance was competent and objectively reasonable.  (ECF No. 7 at PageID 66.)  The Government argues that Varner has not set forth facts or evidence to establish that his counsel caused him actual prejudice or that there is a reasonable probability that, but for counsel's errors, the outcome would have been different.  (*Id.*)

Varner acknowledges that Jermann-Robinson discussed the facts of the case as it relates to the Missouri assault charge.  (ECF No. 10 at PageID 102.)  Varner contends that Jermann-Robinson did not discuss the possibility of enhancement until they received the PSR.  (*Id.*)  At the evidentiary hearing, Varner testified that the six-level enhancement was "one of the enhancements that wasn't necessarily considered because she said, you don't have to worry about these enhancements because they don't apply to you," and it was never discussed before the plea deal.  (ECF No. 50 at PageID 238–40, 261–62.)  None of the discovery or evidence was discussed with regard to this enhancement.  (*Id* at PageID 239.)

Both Varner and Jermann-Robinson were surprised by the application of this victim-related enhancement in the PSR.  (*Id.* at PageID 243, 295–96.)  Jermann-Robinson agreed with Varner's testimony that they never discussed the six-level enhancement before the plea.  (*Id.* at PageID 281.)  Jermann-Robinson said there was no discussion during the change of plea hearing about the video, that an officer had almost been hit, or about a six-level enhancement.  (*Id.* at PageID 302–04.)  She testified that she investigated and spoke to one of the officers who said that it was not a high-speed chase.  (*Id.* at PageID 281.)  Jermann-Robinson knew that the highway patrol threw spike strips, but "that alone to me didn't mean that he was going to get a six-point enhancement."

---

noted that the plea was negotiated without the video and some information about the incident and that this information was not mentioned in the plea colloquy.  (*Id.*)

(*Id.* at PageID 281, 295.)  She "honestly did not know that an officer felt like he was in danger because the officer I talked to didn't say that."  (*Id.* at PageID 281.)

Jermann-Robinson said, "I did miss that six-point enhancement."  (*Id.* at PageID 286.)  But Varner was not guaranteed a specific sentence, and the Court advised "that my calculations may just be an estimate and may not be correct."  (*Id.*)  She testified that the enhancement was significant and amounts to about five years of incarceration.  (*Id.* at PageID 297.)  Still, Jermann-Robinson objected to the enhancement at sentencing and raised an issue on appeal that it was not a knowing plea.  (*Id.* at PageID 298–99.)  She testified that "I want my client to have the lowest sentence possible, but I will say that my miscalculation of the guidelines generally is not a sign that someone is ineffective."  (*Id.* at PageID 300.)  She "used the mechanism [she] had to get him to the Court of Appeals."  (*Id.* at PageID 300–01.)  She believed that Varner would have pled guilty anyway because of the 25-year consecutive sentence on Count 4.  (*Id.* at PageID 304.)

Based on the record, Jermann-Robinson conducted some investigation into the Missouri arrest, obtained the dismissal of the charge, and spoke with an officer.  However, her investigation did not reveal that an officer felt he was in danger.  Based on the evidence available to her at the time of the plea, she had no reason to believe that the six-level enhancement would apply.  To that extent, counsel's performance in investigating the circumstances of the Missouri arrest was reasonable because the dash camera video was not made available to the prosecution or defense at the time of the plea, and Van Meter's testimony at sentencing was a surprise to the defense given the information that Jermann-Robinson had received previously in her investigation.  At no point did she guarantee Varner a sentence of a certain length or that only certain sentencing enhancements would apply.  He was not prejudiced because he was aware of the statutory maximum penalties that he faced, the evidence was not in his favor, and he greatly benefited from

the sentence reduction he received due to the plea bargain.  Counsel's performance was not ineffective concerning the Pemiscott County arrest or the victim-related sentencing enhancement.

### 2.  Counsel's Advice

Varner argues that Jermann-Robinson gave him erroneous advice about the physical restraint sentencing enhancement and his criminal history category.  (ECF No. 1-2 at PageID 23–25.)  In considering the plea, Varner focused on the acceptance of responsibility credit which would reduce the sentence computation by three points and result in less sentencing exposure.  (*Id.* at PageID 23, 25.)  He contends that, if he had been given the correct advice, he would have concluded that signing the plea agreement would be futile.  (*Id.* at PageID 25.)

### a.  Physical Restraint

In Paragraph 24 of the PSR, a two-point enhancement for physical restraint was applied because Varner's codefendant Fuller pointed a firearm at three employees and directed them at gunpoint to the rear of the store.

> Pursuant to USSG § 2B3.1(b)(4)(B), if any person was physically restrained to facilitate commission of the offense or to facilitate escape, increase by two levels. During the robbery at the T-Mobile store located at 8385 Highway 64, the co-defendant pointed a firearm at employees James Kellum, Garrett Matheny and Teresa Garner, and directed them at gunpoint to the rear of the store.

(*See* PSR ¶ 24.)

Varner contends that, after reviewing video of the robbery, discovery, witness statements and the like, Jermann-Robinson should have been able to determine the possibility that a physical restraint enhancement may be applied.  (ECF No. 1-2 at PageID 23.)  Varner contends that, on numerous occasions, Jermann-Robinson ruled out the possibility of that enhancement although "the actions of co-defendant Fuller flashing a weapon and demanding Kellum, Garner, and Matheny to go to the back of the store . . . rendered 'movement' as forcible restraint" under

U.S.S.G. § 2B3.1.(4)(B).  (*Id.* at PageID 23–24.)  Varner asserts that, on September 6, 2013, prior

to the plea deal, Jermann-Robinson specifically told him "that I would not be enhanced for physical

restraint because there was not physical restraint in either robbery."  (ECF No. 10 at PageID 104;

*see* ECF No. 50 at PageID 235.)

Varner contends that, *after* the PSR was received, Jermann Robinson "opined" that it was

a matter to be determined by the court and that she would object at sentencing.  (ECF No. 10 at

PageID 104.)  Varner argues that his counsel's advice fell below a level of competence because

she was aware of a circuit split on this issue, with the Sixth Circuit in favor of the mere movement

of victims being sufficient to apply the enhancement.  (ECF No. 1-2 at PageID 24–25.)  Varner

contends that, if he had been advised correctly as to his criminal history category, he would have

had information on the possibility of the § 2B31.(b)(4)(B) enhancement, the plea deal and the

benefit of the acceptance of responsibility deduction would have been futile.  (*Id.* at PageID 25.)

In response, Jermann-Robinson states that she "did discuss this matter with Mr. Varner and

opined that this would be a matter to be determined by the Court."  (ECF No. 7-1 at PageID 77.)

She advised Varner that, because he was not in the store for the second robbery, she would object

at the sentencing hearing.  (*Id.*)

At the evidentiary hearing, Jermann-Robinson testified that she offered Varner her opinion

about whether the physical restraint guideline would apply.  (ECF No. 50 at PageID 293.)  She

thought that "prior to the plea, we had talked about the fact that a gun had been used and that there

had been movement on the part of the victim."  (*Id.* at PageID 287.)  She said, "I think I said it

might, but I would object to it" because he was not the person in the store.  (*Id.* at PageID 293,

287.)  She objected to the PSR and to the enhancement at sentencing, and the Government put on

30

victims and a law enforcement officer as witnesses.  (*Id.* at PageID 287.)[8]  However, the Court

found that, based on the victims' testimony, "clearly. . . they were restrained and the reasons they

did the things was because of the actions of the – the defendant, I believe it was Mr. Fuller.  And,

of course, this is an adding and abetting situation, and Mr. Varner has to be held accountable for

that activity as well."  (*See* Cr. No. 13-20173, ECF No. 97 at PageID 272–73.)

The Court credits the testimony from Varner and Jermann-Robinson about the review and

discussion of the sentencing enhancements.  Again, the Court notes that no sentence was

guaranteed, that the Court in the plea colloquy advised Varner of the maximum penalties, and that

the ultimate determination of the sentence would be made by the Court.  Jermann-Robinson's

performance was reasonable in raising the issue of physical restraint and presenting objections and

arguments to application of the sentencing enhancement.  Further, for the reasons previously

stated, Varner has not demonstrated that he was prejudiced based on the totality of the evidence

against him, his lack of defense, and the benefit he received from the plea.  Counsel was not

ineffective with regard to the physical restraint sentencing enhancement.

### b.  Criminal History Category

Varner was sentenced in Criminal History Category II because of two Missouri convictions

for possession of marijuana.  *See* PSR ¶¶ 42, 43, 47 & 48.  Varner argues that his criminal history

consisted of two misdemeanor convictions, of which counsel was fully aware.  (ECF No. 1-2 at

PageID 24.)  He contends that his counsel advised him that he would be sentenced "under nothing

---

[8] Jermann-Robinson objected to the physical restraint enhancement arguing that "Varner was unaware that Mr. Fuller had restrained anyone in the second robbery."  (Cr. No. 13-20173, ECF No. 82 at PageID 165.) At sentencing, Jermann-Robinson noted the circuit split about what is required for physical restraint and argued that there needs to be actual movement based on the guns being on the victims.  (ECF No. 97 at PageID 262–65, 270–73.)

more than Criminal History Category I because his criminal history points did/will not exceed 1-point." (*Id.*)  Varner argues that his counsel fell below a level of competence and an objective standard of reasonableness when she failed to perceive that he could have a greater criminal history category. (*Id.*)  Varner asserts that his counsel admitted to giving erroneous advice. (*Id.*)

Jermann-Robinson denies that she misrepresented Varner's criminal history and specifically denies "that I ever told Mr. Varner that his two separate misdemeanor convictions would each result in one-half of a criminal history point." (ECF No. 7-1 at PageID 77.)  She states that she made an estimate of the guideline range and told Varner that the Court will ultimately determine the sentence. (*Id.*)

Varner argues that Jermann-Robinson disputes that she told him that he would be in Criminal History Category I, but she does not dispute that she told him he would receive 101 months. (ECF No. 10 at PageID 103.)  Varner argues that "[s]he contradicts herself because the only way that she could have estimated 101 months if she predicted me landing in Criminal History Category I." (*Id.*)  Varner goes into detail about the discussions on criminal history category stating:

> On 9-6-2013, Mary told me that my base offense level was 20.  She told me that I would receive a 5-point enhancement for the use of a weapon which would put me at 25.  She told me that I would receive a 3 point decrease for acceptance-of-responsibility which would put me at 22.  She then told me that I would remain in criminal history category I because my two misdemeanor convictions were only a half-point each and would aggregate to ONE criminal history point.  She then told me that at level 22, in criminal history category I, I would be at 41-51 months and that the court would give me the "low end" of 41 months consecutive to 60 months for the 924(c).  That is how Mary got to 101 months and although she specifically denies mispresenting my criminal history to me, she doesn't deny profusely telling me and my mother 101 months.  If she had advised me correctly, then she would have told me that I was in criminal history category II whereas there is no way that she could have came up with 101 months.

(ECF No. 10 at PageID 103.)

At the evidentiary hearing, Varner's testimony was consistent with his prior assertions that he and Jermann-Robinson discussed criminal history and determined that he was in Criminal History Category I.  (ECF No. 50 at PageID 267–68.)  Jermann-Robinson agreed that they discussed criminal history category, but she said "I don't even understand what he's saying about half point.  I'm not aware of any half points that are given in a case like this."  (*Id.* at PageID 286.)  On cross-examination, she admitted that she had previously estimated that Varner was in Criminal History Category I and that her estimate was incorrect.  (*Id.* at PageID 297, 306.)

Although her estimate was incorrect, it was, in fact, an estimate.  Varner was aware of the maximum penalties from his plea colloquy and that the Court would ultimately determine his sentence based on calculations in the PSR.  Varner has not demonstrated prejudice by showing that there was a reasonable probability that he would have gone to trial and faced a sentence of more than thirty (30) years, instead of accepting the plea that resulted in his present sentence.

### c.  Full Nature of Charges & Consequences

Varner alleges that his counsel did not advise him about the full nature of the crime and the consequences of his guilty plea due to her ineffectiveness.  (ECF No. 1-2 at PageID 25–26.)  Varner asserts that, when he pled guilty, his counsel had not yet obtained the video showing danger to the Missouri state trooper, had not investigated the incident, and could not properly advise him about the ramifications of his plea, specifically the potential for a sentence enhancement based on the incident in Pemiscott County.  (*Id.*)  Therefore, his guilty plea was not knowingly and voluntarily entered.  (*Id.*)

Varner asserts that the video would have prompted him to locate his alibi witness sooner.  (*Id.* at PageID 26.)  He contends that his counsel was aware of the alibi witness before Varner entered his guilty plea, but Jermann-Robinson was unable to locate the alibi witness.  (*Id.*)  Varner

asserts that the alibi witness would have been able to testify that Varner was at her house during the second robbery. (*Id.* at PageID 27.) The witness agreed to testify and gave counsel her contact information and what she would say if the case went to trial. (*Id.*) Varner asserts that he would not have entered into the plea agreement under the presumption that it was more beneficial if his counsel had been more accurate about the circumstances of the case. (*Id.*)

Varner asserts that he filed a motion to withdraw his guilty plea as a direct consequence of learning that his codefendant received a 16-year sentence in late December 2013. (*Id.* at PageID 27, 29–30.) Varner felt that his counsel's deficiency was a significant detriment to him. (*Id.* at PageID 27–28.) Varner expressed concern about possible coercion from counsel in his letter to Judge Fowlkes. (*Id.* at PageID 28; *see* ECF No. 1-3 at PageID 35–36.) But, after the hearing on January 9, 2014, Varner and Jermann-Robinson thought it was in Varner's best interests to move for a withdrawal of the plea based on newly discovered evidence, instead of coercion. (ECF No. 1-2 at PageID 28.)

The Government responds by noting that the Sixth Circuit Court of Appeals determined that Varner knowingly and voluntarily entered the plea and that the "plea agreement correctly listed the statutory range of penalties and there is no indication that Varner was not aware of the nature of the charge which he pleaded or the consequences of the plea." (*See* ECF No. 5 at PageID 68–69; *see* Cr. No. 13-201473, ECF No. 109 at PageID 751.) *See Varner*, 598 F. App'x at 391–92. Further, the Government relies on Jermann-Robinson's affidavit which states that she reviewed and discussed the discovery and facts, that Varner could be convicted of both § 924(c) violations with those sentences alone being no less than a mandatory 30 years, and that although she was not aware of the dash-cam video, she did obtain a copy of the order dismissing the charges,

discussed the facts of the case with Varner, interviewed officers involved, and determined that it was not a high speed chase.  (Civ. No. 15-2797, ECF No. 7 at PageID 69.)

Between Varner's review of the charges and *possible* sentence with counsel, the plea colloquy, and Varner's acknowledgments about the benefits of the reduction for acceptance of responsibility and the dismissal of the second § 924(c) charge, it is clear that Varner understood the nature of the charges and the potential sentencing consequences that he faced.  As stated previously and by the Court at sentencing, Varner had a full understanding of the charges against him and his sentencing exposure but he was not happy, after the fact, about the deal that he made. The proper, clear, and thorough plea colloquy cured any misunderstanding that Varner may have had about the consequences of his plea.  *See Pola*, 703 F. App'x at 423; *see Thompson v. United States*, 728 F. App'x 527, 535–36 (6th Cir. 2018) (finding no prejudice where the defendant "understood the potential penalties for the charged offenses; that he had discussed the sentencing guidelines with attorney McAfee; and that the sentence ultimately imposed by the district court may be different from any estimate given to him by McAfee, government counsel, or anyone else").  Again, Varner has not demonstrated that his counsel was ineffective.

The Court finds that Varner has not demonstrated ineffective assistance of counsel for any of his asserted claims.

## B.  THE *TAYLOR* CLAIM

In *United States v. Taylor*, 142 S. Ct. 2015 (2022), the United States Supreme Court held that attempted Hobbs Act robbery does not qualify as a crime of violence under the elements clause of the statutory definition of crime of violence, as predicate for felony conviction and enhanced sentence for using a firearm in furtherance of a crime of violence.  The decision was issued during

the pendency of the § 2255 motion, and the Court directed the parties to brief the effect, if any, that *Taylor* had on Varner's § 924(c) conviction.  (*See* ECF No. 42.)

Varner argues that *Taylor* applies and should vacate his conviction on Count Two.  (ECF No. 44 at PageID 205, 208.)  The Government contends that Varner procedurally defaulted his *Taylor* claim and has not demonstrated cause and prejudice or actual innocence to overcome the procedural default.  (ECF No. 43 at PageID 197–200.)  The Government asserts that under *Bousley v. United States*, 523 U.S. 614 (1998), Varner cannot argue that it would have been futile to raise the claim under binding circuit precedent because he had the "tools to construct" a challenge to the classification of attempted Hobbs Act robbery before *Taylor*.  (*Id.* at PageID 198–99.)  Further, the Government acknowledges that a defendant, like Varner, can argue that the invalidity of the predicate offense excuses his default because he did not in fact commit a § 924(c) predicate offense.  (*Id.* at PageID 199.)  However, the Government contends that, under *Bousley*, because it has forgone more serious or equally serious charges in the course of plea bargaining, the showing of actual innocence must extend to those charges.  (*Id.*)  The Government asserts that *Bousley* contemplates that, if the Government had foreseen *Taylor*, it would not have dropped the other § 924(c) charge.  (*Id.* at PageID 199–200.)  The Government argues that Varner cannot demonstrate his innocence on Count 4, the dismissed § 924(c) charge.  (*Id.* at PageID 201.)

Varner relies on *Braden v. United States,* No. 3:21-cv-0818, 2022 WL 4370994 (M.D. Tenn. Sept. 20, 2022), to support vacating Count Two.  Braden pled guilty to certain claims and waived his right to collateral review.  *See id.* at *2.  Other claims were dismissed.  The court had found that the waiver language in the plea agreement was ambiguous and that it did not prevent Braden from being granted relief under *Taylor*.  *Id.* at *2-3.  Further, the Court found that Braden was actually innocent because he was convicted of a non-existent crime.  *Id.* at *3.

Varner relies on *United States v. Young*, No. 20-6820, 2022 WL 3274167, * (6th Cir. Aug. 11, 2022), to support his argument that his § 924(c) conviction be vacated.  (ECF No. 44 at PageID 206–07.)  However, Young pled guilty on all of the counts in his indictment.  *Id.* at *4.  There was no deal to dismiss certain charges and no waiver of collateral review rights, like in Varner's case.

Varner waived his right to collateral review except for claims of prosecutorial misconduct and ineffective assistance of counsel.  A defendant may waive any right including the right to bring future post-conviction challenges in a plea agreement if he relinquishes that right knowingly and voluntarily.  *Portis v. United States*, 33 F.4th 331, 334 (6th Cir. 2022).  Unlike the Court in *Braden*, this Court does not find the waiver in Varner's plea agreement to be ambiguous.

Later developments in the law that would make a right to bring a postconviction challenge more valuable do not make the plea involuntary or unknowing or otherwise unbinding.  *Id.* (citing *United States v. Bradley*, 400 F.3d 459, 463 (6th Cir. 2005)); *see Grzegorczyk v. United States*, 142 S. Ct. 2580 (2022) (denying petition for writ of certiorari "[b]ecause the Seventh Circuit correctly concluded that the defendant's unconditional guilty plea precluded any argument based on the new caselaw").  A voluntary guilty plea that is intelligently made in the light of the then current applicable law does not become vulnerable because later judicial decisions may cause the defendant to reconsider the plea.  *Portis,* 33 F.4th at 335.  "[F]uture changes in law do not vitiate collateral-challenge waivers." *Id.*

Varner has argued that his § 924(c) conviction is not constitutional under *Taylor* because it is based on the predicate offense of attempted Hobbs Act robbery.  However, *Portis* advises that Varner's waiver in the plea agreement is enforceable so long as it is knowing and voluntary, and the change in law with *Taylor* does not affect the enforceability of the waiver.  *See Jimenez v. United States*, No. 21-5201, 2022 WL 2610337, at *2 (6th Cir. July 2022), *cert. pet. filed*, No. 22-

536, 2022 WL 17668332 (Dec. 12, 2022); *see Stewart v. United States*, No. 1:20-cv-01234-JDB-jay, 2022 WL 16855792, at *5–7 (denying movant's *Taylor* claim based on collateral waiver), *app. filed* (6th Cir. Dec. 7, 2022); *see King v. United States*, 41 F.4th 1363, 1370 (2022) (refusing "to ignore a defendant's voluntary choice to sign an appeal waiver simply because the law has changed").  Even if the waiver is knowing and voluntary, the Sixth Circuit refuses to enforce a collateral waiver when: (1) a criminal defendant attacks his plea agreement as "the product of ineffective assistance of counsel;" (2) the district court sentences a criminal defendant above the statutory maximum; and (3) a district court punishes a defendant based on his race.  *Jimenez*, 2022 WL 2610337, at *2.

Varner has waived his right to collateral review.  That waiver is knowing and voluntary.  The Court has determined that Varner's counsel was not ineffective with regard to the plea agreement.  Further, his sentence was within the statutory maximum, and there is no allegation that he was sentenced based on his race.  For these reasons, the waiver does not allow Varner to receive relief under *Taylor*.

## V.   CONCLUSION

The motion, together with the files and record in this case "conclusively show that the prisoner is entitled to no relief."  28 U.S.C. § 2255(b).  The § 2255 Motion is **DENIED** and **DISMISSED**.  Judgment shall be entered for the United States.

## VI.   APPELLATE ISSUES

Pursuant to 28 U.S.C. § 2253(c)(1), the district court is required to evaluate the appealability of its decision denying a § 2255 motion and to issue a certificate of appealability ("COA") "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2); *see also* Fed. R. App. P. 22(b).  No § 2255 movant may appeal

without this certificate.  The COA must indicate the specific issue or issues that satisfy the required showing.  28 U.S.C. § 2253(c)(2), (3).  A "substantial showing" is made when the movant demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (citation and internal quotation marks omitted); *see also Henley v. Bell*, 308 F. App'x 989, 990 (6th Cir. 2009) (per curiam) (same).  A COA does not require a showing that the appeal will succeed.  *Miller-El*, 537 U.S. at 337; *Caldwell v. Lewis*, 414 F. App'x 809, 814–15 (6th Cir. 2011).  Courts should not issue a COA as a matter of course.  *Bradley v. Birkett*, 156 F. App'x 771, 773 (6th Cir. 2005) (quoting *Miller-El*, 537 U.S. at 337).  In this case, because reasonable jurists could differ about the effect of the collateral review waiver on Varner's *Taylor* claim,[9] the Court **GRANTS** a limited certificate of appealability to address the *Taylor* claim.

The Sixth Circuit has held that the Prison Litigation Reform Act of 1995, 28 U.S.C. § 1915(a)-(b), does not apply to appeals of orders denying § 2255 motions.  *Kincade v. Sparkman*, 117 F.3d 949, 951 (6th Cir. 1997).  Rather, to appeal *in forma pauperis* in a § 2255 case, and thereby avoid the appellate filing fee required by 28 U.S.C. §§ 1913 and 1917, the prisoner must obtain pauper status pursuant to Fed. R. App. P. 24(a).  *Kincade*, 117 F.3d at 952.

Rule 24(a) provides that a party seeking pauper status on appeal must first file a motion in the district court, along with a supporting affidavit.  Fed. R. App. P. 24(a)(1).  However, Rule 24(a) also provides that if the district court certifies that an appeal would not be taken in good faith, or

---

[9] Both the *Stewart* and *Jimenez* cases are on appeal.  Further, the *Braden* case differs in its analysis and result.

otherwise denies leave to appeal *in forma pauperis*, the prisoner must file his motion to proceed *in forma pauperis* in the appellate court.  *See* Fed. R. App. P. 24(a) (4)-(5).

In this case, for the same reasons the Court grants a limited certificate of appealability, the Court determines that an appeal limited to the collateral review waiver and the *Taylor* issue would be taken in good faith.  It is therefore **CERTIFIED**, pursuant to Fed. R. App. P. 24(a), that a limited appeal, as described, would be taken in good faith, and leave to appeal *in forma pauperis* is to that extent **GRANTED**.

**IT IS SO ORDERED**, this 30th day of June, 2023.

*s/ Mark S. Norris*
MARK S. NORRIS
UNITED STATES DISTRICT JUDGE